UNITED STATES v. PINE RIVER LOGGING & IMPROVEMENT CO. et al.

(Circuit Court of Appeals, Eighth Circuit.   October 31, 1898.)

No. 1,058.

1. CONTRACTS—CONSTRUCTION—STATEMENT OF QUANTITY.
   In the construction of a contract of sale which specifies the quantity of the article or thing sold, such specification will be regarded as material and determinative, notwithstanding its qualification by "more or less" or "about," unless it is apparent or fairly inferable from other parts of the contract that a particular lot of goods was intended to be sold, or enough thereof to satisfy a particular need, without regard to the precise quantity, and that the specification is merely an estimate of the probable quantity thereof.

2. INDIANS—TIMBER ON RESERVATIONS—RIGHT TO CUT AND REMOVE.
   The title to the timber growing or standing on Indian reservations is in the United States, and, in the absence of legislative authority, Indians have no right to cut or dispose of it.

3. SAME—CONTRACT FOR SALE OF TIMBER FROM RESERVATION—LIMITATION AS TO QUANTITY.
   It was not the purpose of congress, by the act of February 16, 1889 (25 Stat. p. 673, c. 172), empowering the president, in his discretion, from year to year, to authorize the Indians on a reservation to cut and sell or dispose of the dead timber thereon, to permit a few to monopolize the privilege; nor can it be supposed that such has heretofore been the purpose of the president, in granting such authority; and where a contract made by an Indian to cut and deliver to a purchaser a certain quantity of timber, "more or less" or "about," to be taken from the dead timber on a reservation, is approved by the president, the quantity stated limits the amount which can be sold, or to which the purchaser can obtain title thereunder, allowance being made only for small and accidental variation.

4. SAME—SUIT BY UNITED STATES—RECOVERY OF TIMBER ILLEGALLY SOLD BY INDIANS.
   The fact that the purchaser had paid for (under such contract) a large quantity delivered and received in excess of that stated in the contract, does not give him title thereto, and is no defense to a suit for its recovery by the government.

5. SAME—POWERS OF GOVERNMENT AGENTS.

An agent of the government charged with the duty of superintending the cutting and removal of timber under such contracts cannot, by his acquiescence in the delivery of quantities in excess of those called for by the contracts, bind the government, the provisions of the contract being obligatory upon him, as well as the parties thereto.

6. SAME—CONSTRUCTION OF STATUTE—DEAD TIMBER.

The act of February 16, 1889 (25 Stat. p. 673, c. 172), empowering the president to authorize the cutting and removal by Indians from their reservations of "dead timber, standing or fallen," includes in such designation, not only standing trees that are entirely dead, but also those which are so vitally injured that a prudent landowner would cause them to be forthwith cut to preserve their value. It does not include living and uninjured trees merely because they stand among trees a large proportion of which are dead.

7. CUSTOM AND USAGE—AFFECTING CONSTRUCTION OF STATUTE—GENERALITY AND UNIFORMITY.

A custom or usage, if ever admissible to affect the construction of an act of congress, by altering the ordinary meaning of ordinary words or phrases, must be shown to have been so prevalent in all sections where the law was to become operative, and so universal in such sections, as to leave no room for doubt that it was known to the lawmakers, and that the statute was enacted with reference thereto.

8. UNITED STATES—ESTOPPEL BY ACTS OF AGENT—SCOPE OF AUTHORITY TO BIND THE GOVERNMENT.[1]

An agent of the United States charged with the duty of superintending the cutting and removal of dead timber from an Indian reservation under certain contracts, to the end that no green or growing timber should be cut, is vested with a discretion to determine whether injured trees are so badly hurt that they ought to be classified as dead timber within the statute; and the government is bound by his decision, if made in good faith, while exercising proper care and diligence in the performance of his duties. But the parties to such contracts cannot found rights upon his derelictions of duty, nor obtain a title to living and uninjured trees, the cutting of which was prohibited by law, because he assented to the cutting or was cognizant thereof.

9. SAME—POWER OF AGENT TO LEGALIZE TRESPASS.

Such superintendent could not legalize a trespass committed by the cutting of living trees in violation of the statute by agreeing, after they were cut and had thus become "dead timber," that they might pass under the contract; and such agreement cannot estop the government from recovering the value of such trees.

10. INDIANS—CUTTING DEAD TIMBER—RIGHTS UNDER APPROVED CONTRACTS.

It is not unlawful for an Indian having a contract, approved by the president, to cut and deliver a certain quantity of dead timber from a reservation, to employ other Indians to cut and deliver timber thereunder in his name.

11. TROVER—DAMAGES RECOVERABLE—EXPENSES.

Expenses of a plaintiff in trover are only recoverable where he actually recovers the property, which fact is pleaded in mitigation of damages. Where the property is not recovered, his recovery is limited to its market value at the time and place of conversion, with interest.

12. INDIANS—SALE OF TIMBER—PAYMENT ON CONTRACT.

Under the regulations established by the president for the cutting of dead timber on Indian reservations, pursuant to the act of February 16, 1889, 10 per cent. of the proceeds of such timber when sold is required to be paid into the poor fund of the tribe. _Held_, that such a payment made directly into such fund by a purchaser, under the terms of his con-

---

[1] As to estoppel against the United States, see note to Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 353.

tract, was not a payment to the United States. for which such purchaser was entitled to credit on a recovery by the government against him for a wrongful conversion of a part of the timber received and paid for under such contract.

In Error to the Circuit Court of the United States for the District of Minnesota.

This was a suit which was brought by the United States, the complaint containing nine counts, against the Pine River Logging & Improvement Company, Joel B. Bassett, William L. Bassett, John S. Pillsbury, and Charles A. Smith, the defendants in error, to recover the value of ⸺2,005,921 feet of pine lumber alleged to have been wrongfully cut and removed from Indian reservations in the state of Minnesota. The defendants justified the cutting and removal of the lumber in question under five contracts with Indians, which were made under and subject to the provisions of an act of congress approved February 16, 1889 (25 Stat. p. 673, c. 172), which provided: "That the president of the United States may from year to year, in his discretion, under such regulations as he may prescribe. authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing or fallen, on such reservation or allotment for the sole benefit of such Indian or Indians. But whenever there is reasonable cause to believe that such timber has been killed, burned, girdled or otherwise injured for the purpose of securing its sale under this act, then in that case such authority shall not be granted."

One of the five contracts under which the defendants justified their action, omitting immaterial portions thereof, was as follows:

"In and for the considerations below named, William Fairbanks (Indian), party of the first part, hereby enters into an agreement with the Pine River Logging & Improvement Company (incorporated), as parties of the second part. to cut, haul, and deliver during the season of 1891 and 1892, on the Mississippi river, below Lake Winibigoshish, about five hundred thousand feet of pine saw logs, to be cut on the Indian reservation from dead and down timber, under the supervision of the United States Indian agent, or his deputies. * * * Said party of the first part further agrees that the second party will pay to the United States Indian department, or its authorized agents, the sum of ten (10) per cent. of purchase price per thousand feet below named for the stumpage of said timber, which shall be deducted from the price per thousand feet named below. As a consideration for this agreement, and for the above-named services, the Pine River Logging & Improvement Company hereby agrees to pay to said first party the uniform price of four and 50/100 ($4.50) dollars per thousand feet, board measure, and one-half scalage for all logs so cut, hauled, marked. and landed in accordance with the following terms. viz.: All moneys to be paid to the United States Indian agent, and to be paid so that the amounts will not exceed the following payments: Three (3) dollars per thousand feet up to the close of the logging season, when all logs are banked and scaled, and the balance of one and 50/100 ($1.50) dollars per thousand feet sixty days thereafter. * * *

"Signed and dated at Lake Winibigoshish, Minnesota, this 27th day of October, A. D. 1891.

his

"William X Fairbanks.

mark.

"* * * * * * * *

"Pine River Logging & Improvement Company,

"By C. A. Smith, Secty.

"* * * * * * * *

"State of Minnesota, County of Itasca, ss.:

"On this 27th day of October, A. D. 1891, before me personally appeared William Fairbanks, who, being duly sworn, deposes and says: That he is of Indian descent; that he has been, and now is, living upon and enjoying the privileges of the Mississippi Indian reservation, and, as such, is entitled

to the rights and considerations as granted him by the government of the United States.

his

"William X Fairbanks.

mark.

"A. R. Rogers,

"Notary Public, Minnesota.

"*    *    *    *    *

"Agreeably with authority of the president indorsed November 24, 1891, on department letter to him of November 16th, 1891, the within contract is hereby approved.                    T. J. Morgan, Commissioner.

"Department of the Interior,
"November 27th, 1891.
"Approved: John W. Noble, Secretary."

Two other contracts of a similar character, with the Pine River Logging & Improvement Company, were introduced, which were approved by the secretary of the interior on the same day and in the same form as above. One of these contracts authorized the cutting of "about one million feet more or less of pine saw logs, to be cut on the Indian reservation from dead and down timber," and the other the cutting of "about five hundred thousand feet of pine saw logs to be cut on the Indian reservation from dead and down timber." Two other contracts were introduced as a justification, which were of the same character as the one above quoted, and were approved by the secretary of the interior on the same day and in the same form, but these contracts were made by Indians with J. B. Bassett & Co., a firm composed of the defendants Joel B. Bassett and William L. Bassett. One of these latter contracts authorized the cutting of "two hundred fifty thousand feet, more or less, of pine saw logs to be cut on the Indian reservation from dead and down timber," and the other authorized the cutting of "five hundred thousand feet, more or less, of pine saw logs to be cut on the Indian reservation from dead and down timber." There were a verdict and judgment below in favor of the defendants, to reverse which the United States has sued out a writ of error.

John E. Stryker, for the United States.

J. B. Atwater (E. G. Hay, Wm. H. Bennett, and A. Ueland, on the brief), for defendants in error.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

THAYER, Circuit Judge, after stating the case, as above, delivered the opinion of the court.

The answer which was filed by the Pine River Logging & Improvement Company (hereinafter termed the "Logging Company") admitted, in substance, that under and by virtue of the three contracts between itself and Indians, which are referred to in the foregoing statement, it had received into its possession, and had converted into lumber, and ultimately sold, an amount of pine saw logs cut upon Indian reservations, which had yielded in the aggregate 13,463,400 feet of lumber, board measure. The defendants Joel B. Bassett and William L. Bassett likewise admitted, in substance, that under the two contracts with Indians above referred to which they had succeeded in obtaining, they had received and converted into lumber, and sold, an amount of pine saw logs cut upon Indian reservations which had yielded in the aggregate 4,136,860 feet of lumber, board measure. In other words, it was disclosed by the pleadings that under the five contracts with Indians above described, which together authorized the cutting and

removal of dead and down timber to the amount of 2,750,000 feet, "more or less," or "about," the defendants had actually received from Indians with whom they had severally entered into the contracts aforesaid no less than 17,600,260 feet of lumber in the shape of pine saw logs, the same being logs that had been cut on Indian reservations, and removed therefrom. The evidence in behalf of the government tended to show that a much greater amount of lumber, to wit, 22,000,000 feet, had been cut and removed under an authority claimed to have been conferred by the aforesaid contracts. In view of these facts, the government, by its counsel, asked the following instruction, which was refused:

"The contracts under which it is claimed these logs were cut provided for the cutting of a total of 2,750,000 feet of logs from dead and fallen trees. The amounts named in the five contracts are qualified by the words 'about' and 'more or less.' I charge you that the amounts named in the contracts are a material part thereof, and the addition of the qualifying words 'about' and 'more or less' is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies. The timber cut in excess of the amount stipulated beyond such accidental variations was illegally cut and removed, whether cut from dead or living trees."

The first question, therefore, which deserves consideration, is whether an error was committed in refusing the foregoing instruction.

When an agreement is entered into to sell and deliver a certain quantity of an article, the amount specified is often regarded as material and determinative of the amount sold, notwithstanding the use of the qualifying words "about" or "more or less" in connection with the amount specified. In many cases the use of such qualifying words in connection with some specified quantity is merely intended to cover the case of a slight variation in quantity, which may be due either to accident, or to an inherent difficulty in making a delivery of the precise quantity sold. Indeed, it seems to be well settled that, when a specified quantity of an article or thing bought or sold is mentioned in a contract, the amount named will always be regarded as material and determinative, notwithstanding the use of the qualifying phrase "more or less," except in those cases where it is apparent or fairly inferable from other parts of the agreement that a particular lot of goods was intended to be sold without reference to the precise quantity, or enough thereof to satisfy a particular need or to answer a given purpose. In the latter class of cases the specification of a particular quantity with the qualifying phrase "more or less" amounts to no more than a rough estimate of the probable quantity, which, in the absence of fraud, is not regarded as binding on either party. Brawley v. U. S., 96 U. S. 168; Norrington v. Wright, 115 U. S. 188, 204, 6 Sup. Ct. 12.

The five contracts that are involved in the case at bar contain no provisions from which it can be reasonably inferred that the several quantities of lumber therein specified were not intended to be determinative of the amount to be cut and delivered, or which would justify the conclusion that the amount to be delivered was to be determined by other circumstances. Tested by the contracts themselves, the inference is plain that the stipulation as to quantity is as material and obligatory upon the parties as any other stipulations which the con-

tracts contain, and that the qualifying words "about" and "more or less" were inserted to cover slight variations from the amounts specified in the several contracts, which could not well be avoided in making the deliveries. This conclusion is supported by other considerations. Until the passage of the act of February 16, 1889, quoted above, in relation to dead and down timber, no right had ever been conferred upon Indians residing on Indian reservations to cut and dispose of the timber standing or growing thereon. It was a well-established doctrine then, as it is now, that the fee to all lands embraced in Indian reservations is vested in the United States; that the Indians residing thereon have merely a right of occupancy; and that they are not entitled to cut and sell timber without express legislative sanction. U. S. v. Cook, 19 Wall. 591; Beecher v. Wetherby, 95 U. S. 517. The act in question, which authorized the cutting and removal of dead and down timber, under such regulations as might be prescribed by the president, was passed for the double purpose of preventing such timber from going to waste, and at the same time providing lucrative employment for such Indians residing on reservations as might desire to take advantage of its provisions. It must be presumed from the nature of the law, and the class of persons to whom it relates, and whom it was intended to benefit, that it was the intention of congress that such profit as might be realized from the sale of dead and down timber should, as far as possible, be shared alike by all reputable Indians residing on a reservation; that equal opportunities to cut and remove the dead and down timber found thereon should, at least, be afforded to all; and that, in administering the act, care should be taken by the executive department of the government in granting licenses for the removal of timber, so that a few favored individuals, backed by large means, might not be able to appropriate all the benefits of the act, to the exclusion of the many. It must also be presumed that the law has heretofore been administered by the executive department of the government, or, at least, that the intention has been to administer it, in accordance with the legislative purpose last expressed. Inasmuch, then, as the approval by the president of the five contracts now in question in effect conferred on a few persons the right to appropriate all the dead and down timber that might be found on certain Indian reservations; if it be true, as is contended, that the stipulations as to quantity therein contained are immaterial and meaningless; and inasmuch as one of the main objects of the law would be defeated by granting to a few favored individuals a roving commission of that character,—it is not reasonable to suppose that any such authority was intended to be conferred when such contracts were approved by the president. It is altogether probable that the provisions found in the several contracts, limiting the total quantity of timber to be cut to 2,750,000 feet, were regarded by the executive department of the government as material and obligatory, and that the agreements were approved by the president upon that theory. Viewing the contracts, then, in the light of well-established rules applicable to their interpretation, and also in the light of the statute under which they were executed, it is clear, we think, that the quantity which could be lawfully cut and removed was definitely

fixed by the contracts, and that there was no warrant in law for cutting an amount of timber which was to any considerable extent in excess of the prescribed quantity.

In opposition to the foregoing views, and as a reason why the defendants should not be held accountable for their logical consequences, it is urged, in substance, that the defendants have already paid the contract price for such timber as was taken in excess of the prescribed quantity; that the timber was also delivered to them by the agents of the United States; and that the position now assumed by the government is "one of rank injustice" to its citizens. Concerning these several statements, it is sufficient to observe that the timber which was cut and removed from the reservation in excess of the prescribed quantity belonged to the United States, and that it has never as yet been paid for the same. The contracts which were approved by the president amounted to no more than a license to receive and appropriate a certain quantity of timber, and to pay the agreed price for the cutting and removal thereof to certain Indians. The transaction on the part of the government was, in substance, a gift of a certain amount of timber to certain Indians. All the timber which was appropriated in excess of the stipulated amount was wrongfully taken, and such payments therefor as may have been made by the defendants to third parties by whom the timber was wrongfully cut and removed cannot be permitted to prejudice the right of the United States to recover its value. Moreover, no agent or officer of the United States who was on the ground when the deliveries took place had a shadow of authority to sanction a delivery of timber to any considerable amount, in excess of the quantity specified in the several agreements, under color of which the timber had been cut and removed. These agreements were as obligatory upon all agents and officers of the government who were concerned in the deliveries as they were upon the parties to the several agreements, and none of the agents or officers there present were vested with the power either to alter or modify their provisions with respect to the quantity of timber that might be delivered, or to estop the United States from asserting its rights by any act of omission or commission. Whiteside v. U. S., 93 U. S. 247, 257; In re Floyd Acceptances, 7 Wall. 666; Bowe v. U. S., 42 Fed. 761, 778.

Neither do we perceive that the plea of good faith, which is so earnestly urged in behalf of the defendants, can be of any avail, or is entitled to serious consideration. All of the defendants, except John S. Pillsbury and C. A. Smith, were parties to one or more of the contracts, under color of which the timber was received and appropriated. They do not occupy the position of innocent third parties, who bought and paid for the logs after they had been removed from the reservation, and had entered the market, but they received and paid for the same with full knowledge of every provision which the contracts contained, and with full knowledge that, under licenses permitting the removal of dead and down timber to the amount of 2,750,000 feet, they were certainly receiving more than six, and possibly as much as eight, times that amount. As they cannot be heard to plead ignorance of the law as an excuse for their misconduct, the pretense

that the action of the government savors of injustice when it seeks to compel them to pay for property which they have wrongfully taken and appropriated is entitled to little weight. On this branch of the case, therefore, we are constrained to hold that the instruction heretofore quoted contained a correct declaration of the law applicable to the case, and that it should have been given.

Another controversy of much importance arose on the trial below, and has been renewed here, concerning the meaning of the phrase "dead timber." Counsel for the government appears to have taken the extreme view that a dead tree, within the meaning of the statute, was one which was utterly destitute of vitality, at least in its trunk and branches. On the other hand, the defendants contended, and their view was substantially adopted by the learned judge of the trial court, that trees should be esteemed dead if they were injured by fire or other cause so "that they will die within a reasonable period, although at the time they are living, and have green tops and other signs of life." A further contention of the defendants, which was also sustained by the trial judge, was to the effect that even living trees which were unaffected by fire or other casualty might be properly classed as dead trees, provided they were found standing in a clump of trees a large number of which were so badly injured by fire that they would die within a short time. This latter contention of the defendants was based upon testimony, which was offered by the defendants, and objected to by the government, to the effect that lumbermen generally regarded and classified uninjured living trees, thus situated in the midst of dead trees, as themselves dead, or as included by the phrase "dead timber."

We are of opinion that the position assumed by the government was not tenable. If the phrase "dead timber" should be held to include only such trees as are utterly destitute of vitality in their trunks and branches, it would probably happen that much valuable timber would be lost, and that one object of the statute which is now under consideration would be frustrated by waiting for such a state of decay to be reached. In the course of a single season a tree might become to a large extent valueless for the purpose of making lumber, although at the commencement thereof it manifested considerable signs of life, and, if it had been then or previously cut, would have yielded a goodly quantity of lumber. In this respect the law should be given a reasonable interpretation, having in view the purpose of the lawmaker.

While, for the reasons last indicated, we are not able to adopt the extreme view advocated in behalf of the government, we are equally unable to assent to the proposition that, under the provisions of the act here in question, living and uninjured forest trees may be classed as "dead timber," provided they stand among other trees many of which are so badly hurt that they will die in a short time. It is hardly necessary to observe that, if the phrase "dead timber" was thus interpreted, it would afford a convenient excuse for stripping Indian reservations of a large amount of the living timber at present standing or growing thereon, since, in view of the frequency of forest fires at certain seasons of the year, it is probably true that many of

the large bodies of timber found on Indian reservations are interspersed more or less thickly with trees which have been injured so badly by fire that they will shortly die.  Under the instructions which were given by the trial court, such bodies of timber could be entirely removed under licenses granted to cut "dead and down timber," on a simple showing by the licensees that a large number of the trees found on such tracts had been so badly injured by fire that they would most likely die.  It is hardly probable, we think, that congress foresaw and intended an interpretation of the phrase "dead timber" which would lead to such a result.  The phrase was doubtless used by the lawmaker in its ordinary sense, to describe timber which was practically lifeless or mortally hurt, and in such a state of decay that a prudent landowner would ordinarily direct it to be forthwith cut to prevent a further deterioration in value.

The testimony on which the defendants found their claim that the phrase "dead timber," as used in the statute, comprehends living and uninjured trees in a certain situation, was clearly inadequate, we think, to support a finding by the jury that the phrase "dead timber" had acquired the meaning imputed to it by the defendants, and that it was used in that sense by congress, by reason of a well-known custom or usage prevalent throughout the United States, or prevalent throughout a large portion of the United States.  No attempt was made at the trial to show the territorial extent of the alleged practice of classifying living trees as dead trees, nor to prove that such practice was uniform among all classes of people, even in the locality where the practice was said to prevail.  The testimony on this head was, in substance, that lumbermen in a given locality were in the habit of speaking of a clump of trees, the greater portion of which had been killed or badly injured by fire, as "dead timber."  One witness testified, in substance,—and his testimony may be taken as a fair sample of the residue of the evidence on this point,—that, if called upon to examine a 40-acre tract of timber, he would report the tract as dead timber, although he would by no means term the living trees dead trees, if he found that the greater portion of the trees had been destroyed by fire.  Assuming the several statements of the witnesses to be true, they were not sufficient, in our judgment, to control the interpretation of a public statute to the extent of giving to certain words therein found a meaning which was clearly opposed to their ordinary signification.  The proper office of a custom or usage is to explain the meaning of a private contract which is so vague or uncertain that the intent of the parties thereto cannot be determined without the aid of such extrinsic evidence.  Barnard v. Kellogg, 10 Wall. 383; Robinson v. U. S., 13 Wall. 363.  And, while it may be that proof of a custom or usage is sometimes admissible to aid in the construction of a statute as well as a private contract, yet when it is offered for that purpose, and with a view of altering the ordinary meaning of ordinary words or phrases, the evidence concerning the usage ought to show that it was prevalent in all sections where the law was to become operative, and was so far universal in the sections where it prevailed, as to leave no room for doubt that the usage was known to the lawmaker, and that the statute which it

serves to modify was enacted with reference thereto. Giving to the evidence which was adduced in the case at bar its full weight, it was insufficient to establish a usage of that character. We are of opinion, therefore, that the trial court erred in permitting the jury to find that a custom or usage existed which would serve to change the ordinary meaning of the phrase "dead timber" so as to make it include living and uninjured trees. These latter words, as heretofore intimated, when used with reference to standing timber, should be held to include only such trees as are in fact lifeless, and those which are in such a state of decay in consequence of fire or other casualty that a prudent landowner would cause them to be cut forthwith, to prevent a further deterioration in value.

A question also arose in the trial court concerning the extent to which the government would be bound by the acts of its logging superintendent, one T. W. Tidd, who had been designated by the department of the interior to supervise the cutting and removal of timber under the five contracts now in question. Certain exceptions were taken to the charge of the trial judge on this point, which bring the question before this court for consideration. The duties devolved upon the aforesaid officer by departmental rules and regulations were "to go into the woods with the loggers, and superintend and direct their labors, to the end that no green or growing timber may be cut, and that no live trees are damaged in any manner so as to cause them to die, that they may be marketed under the provisions of the act in question, and to inspect the scaling of the logs."

The instructions which were given on this head were to the following effect: First, that if, without conspiracy or procurement on the part of the defendants, certain timber was wrongfully cut by loggers, with the approval and under the oversight of the logging superintendent, by reason of his mistaken view of the terms of the contracts or the character of the timber, such action on the part of the government's representative would bar a recovery against the defendants for the timber so unlawfully cut; second, that if living timber was wrongfully cut by Indians under color of the contracts, without the knowledge or approval of said superintendent, then the government could recover the stumpage value of the living or green timber so cut, less ten per cent., although such timber was not cut by reason of a conspiracy among the defendants to obtain the same, or by their procurement.

After declaring the law in the manner last indicated, the court made the following statement, hereafter referred to as the third instruction:

"The government appointed its own agent for the purpose of supervising and overseeing the cutting of this timber; so that *if timber was cut by the loggers of the character which the government agent directed the loggers to cut, or assented to their cutting under the contract, the government would be foreclosed with respect to all such timber. The government is bound by the action of its representatives just the same as any other person would be who appointed an agent to look after his own interests and matters.* But the loggers would not have the right to cut green timber of the character not described; and, if they did that without the knowledge or consent of the government representative,—did it wrongfully, and without his knowledge or assent,—they would get no title to the logs, and they could not deliver any title to the de-

fendants, even though the defendants might be innocent of any participation in it."

The exceptions which were taken by the government were addressed to the first of the foregoing instructions, and to that portion of the third instruction which has been placed in italics. The first of these instructions might be upheld if the court intended to say, and was understood as saying, that the government was not entitled to recover for timber cut and removed from the reservation, in those instances where, as the result of honest mistakes of judgment on the part of the logging superintendent which were committed while he was giving due attention to the performance of his official duties, certain injured trees were classified as dead timber, and removed, which in fact ought not to have been so classified. If thus understood, the instruction was substantially correct. The determination of what timber was "dead timber," in the eye of the statute, as that phrase has heretofore been defined, involved the exercise of judgment and discretion on the part of the logging superintendent; and, as he had been appointed to decide such questions, his decisions thereon, if made in good faith, after the exercise of due diligence to advise himself concerning the character of the timber which was being cut and delivered, ought to be regarded as binding upon the government. Elliott v. Railway Co., 40 U. S. App. 61, 21 C. C. A. 3, and 74 Fed. 707; Lewis v. Railway Co., 49 Fed. 708; Wood v. Railroad Co., 39 Fed. 52, and cases there cited.

The third instruction shows, however, that the learned trial judge intended to concede, and was doubtless understood as conceding, to the logging superintendent, a greater authority to bind the government than is last indicated. The instruction contained a statement, in substance, that the government was bound by the action of its logging superintendent to the same extent that a private individual would be bound by the actions of his agent, and that if timber was cut by direction of the logging superintendent, and with his assent, the government was foreclosed as to such timber, provided the defendants had done nothing to influence his conduct. This left the jury at liberty to infer that the government could not recover the value of any living or green timber that had been cut with the knowledge and without objection on the part of the logging superintendent, although it was manifest that he had been guilty of a gross and willful neglect of his official duties, and had made no pretense of discharging them in accordance with law. In other words, it left the defendants at full liberty to profit by derelictions of duty on the part of a public officer, provided they had not caused or inspired such conduct on his part.

For the reasons already indicated, the exceptions to the instructions now under consideration were well taken. It is well-established law that the United States is not liable to individuals for, and is not affected by, the unauthorized acts of its officers, nor for their misfeasances or laches. Gibbons v. U. S., 8 Wall. 269, 274; Minturn v. U. S., 106 U. S. 437, 444, 1 Sup. Ct. 402; Hart v. U. S., 95 U. S. 316; U. S. v. Kirkpatrick, 9 Wheat. 720; Stansbury v. U. S., 8 Wall. 33; Moffat v. U. S., 112 U. S. 24, 5 Sup. Ct. 10. The defendants well knew that no executive officer of the United States, not even the president him-

self, could authorize the cutting and removal of living and uninjured timber standing on public lands, including Indian reservations, the fee to which is in the United States, because such acts had been prohibited by a public statute (Rev. St. U. S. § 5388), and were not authorized by the act of February 16, 1889 (25 Stat. c. 172), in relation to dead and down timber. They were also well aware that one of the duties imposed on the logging superintendent was to see that no green or growing timber was cut or injured, and that they could only seek shelter behind the decisions of the superintendent, in those cases where it was properly within his province to determine whether injured trees were so badly hurt, and liable to deterioration in value, that they ought to be classified as dead, and immediately cut. The defendants, therefore, should have been held liable for the value of all living and uninjured trees which were cut and removed, and ultimately came into their possession, irrespective of the action of the logging superintendent, for the reason that he had no power to vest them with a title to such timber.

In line with the view which appears to have been entertained by the trial court concerning the authority of the logging superintendent to bind the United States, the jury were further instructed, in substance, that, where green trees had been cut by loggers without the knowledge of the superintendent, he could, after discovering that they had been wrongfully cut, bind the government by consenting that such timber might go in under the contract, because, when living trees were once cut, they were then "dead and down timber." We think that this instruction was erroneous, for the reason that the superintendent had no power to legalize a trespass, and estop the government from recovering the value of such timber.

The remaining questions which the record presents are of less moment, and will be noticed on this occasion simply for the reason that they may arise on a second trial. It seems that some evidence was offered during the progress of the trial which tended to show that three Indians had cut a certain amount of timber on the reservation without having any contracts of their own which permitted them to do so; that such cutting had been done, however, under color of authority conferred by two of the contracts heretofore mentioned; that, with the assent of the owners of those contracts, the logs had been delivered to the defendants as if cut by the contractors themselves, to discharge their own obligations under said contracts; and that the owners of the contracts had received payment for the logs as if cut by themselves with the knowledge and implied assent of the logging superintendent. With reference to this subject, the court charged the jury, in substance, that, while the contracts in suit were not assignable, yet that the owners of the contracts would have the right to employ other persons to cut for them under the contracts, and that whatever agreement they might make between themselves and their employés to that end would be a matter of no concern to any one except themselves. We perceive no error in giving this instruction. The owners of the several contracts did have the right to employ other persons to cut for them the amount and kind of timber specified therein. The employment of persons for that purpose was

not tantamount to an assignment of the contracts, and was not unlawful.

On the trial below, the government asserted a right to recover as damages for the wrongful cutting of its timber, not only the value of the timber, but the expenses which it had incurred in identifying and recovering the same. This contention was overruled, and an exception was saved. The proof shows that the logs in controversy were first seized by the United States on the bank of a stream in northern Minnesota, where they were deliverable, and that under certain agreements between the United States and the defendants, which were fully explained in U. S. v. Pine River Logging & Improvement Co., 49 U. S. App. 24, 24 C. C. A. 101, and 78 Fed. 319, when this case was formerly before this court, the United States, without waiving any of its rights, released the logs that had been seized, and permitted the defendants to raft them to the city of Minneapolis, where they were sawed into lumber. The lumber was eventually sold by the defendants, as the government claimed, without its consent and wrongfully. The expenses which the government sought to prove on the trial were such as it had incurred, after the wrongful seizure and release of the logs, in hunting up evidence to establish its case.

The rule permitting a plaintiff in an action of trover to have an allowance for expenses by him incurred in recovering property that has been wrongfully taken seems to have been applied heretofore only in those cases where the property is actually recovered by the plaintiff, and such recovery is pleaded by way of mitigation of damages. When the damages are thus mitigated, the plaintiff is permitted to recoup his necessary expenses in recovering the property; but where there has been no eventual recovery of the property by the plaintiff, and he is compelled to take its value, as in the case at bar, the better view seems to be that the recovery is limited to the market value of the property at the time and place of conversion, and interest. Ewing v. Blount, 20 Ala. 694; Collins v. Lowry, 78 Wis. 329, 47 N. W. 612; Cattle Co. v. Hall, 33 Fed. 236, and cases there cited; 3 Suth. Dam. (2d Ed.) § 1141. No error was committed, therefore, by the trial court, in excluding the evidence as to expenses that had been incurred by the United States which it sought to introduce.

Under regulations which have been established by the president of the United States for cutting dead and down timber on Indian reservations, pursuant to the act of February 16, 1889, Indians who obtain licenses to cut such timber are required to pay 10 per cent. of the gross proceeds of all dead and down timber cut and sold, to the poor fund of the tribe, to aid in the support of old, sick, and helpless members of the tribe. The contracts involved in the case in hand recognized the existence of this regulation, and, in accordance therewith, provided for the payment of 10 per cent. of the purchase price of all timber cut and removed, to the United States Indian department. Ten per cent. of the purchase price for all timber received under color of the contracts was accordingly paid by the defendants to the proper Indian agent, and the trial court charged that the defendants were entitled to a credit therefor in assessing the damages for green and living timber which was found to have been wrongfully cut and re-

moved. We feel constrained to hold that this instruction was erroneous. If the defendants received and disposed of living and uninjured timber which was wrongfully cut, they are liable to the government for its full value. We are unable to perceive any legal ground upon which payments that they may have made into the Indian poor fund for the support of indigent Indians can be accepted or regarded as payments made to the United States for its benefit. Such payments stand on the same footing as a payment made to a third party, inasmuch as the government received the money simply as a trustee for the benefit of poor Indians, and has doubtless expended it for their benefit.

Another question was raised at the trial, and an exception was duly saved, which will be noticed briefly, because it has been discussed in the briefs, although it is not distinctly raised by the assignment of errors. The question is whether the trial court, at the conclusion of the government's testimony, properly required it to elect whether it would take the value of the logs in controversy at the place where they were originally seized,—that is, in northern Minnesota,—or, in lieu thereof, would take the value of the lumber which was made therefrom at the city of Minneapolis, at which place, as it was claimed, the lumber was wrongfully sold. The trial court ruled, in substance, that, after the government had closed its case, it was no more than reasonable to require it to state at what place and time it would elect to have its damages assessed, because it could not recover the value of the logs and also the value of the lumber made therefrom, and because it would be unnecessary to enter upon a long inquiry as to the cost of rafting the logs to Minneapolis, and sawing them, provided it determined to take the value of the logs in northern Minnesota, and to have its damages assessed at that time and place. We fully concur in the views of the trial judge on this point, and are unable to see that the ruling in question placed the government at any disadvantage, or prejudiced its rights to any material extent.

The government further insists that the trial court erroneously refused to permit one of its witnesses to detail a conversation which he had with a person by the name of Galbreath, who was a foreman of one of the logging camps where a portion of the logs in controversy were cut, which conversation occurred at the camp during the winter of 1891 and 1892, and related to the character of the timber, whether living or dead, which was being cut. It also complains because one of its witnesses was not allowed to answer the question whether he regarded trees which had been burned from six inches to six feet from the butt upwards as dead timber; also because another witness was not allowed to describe the effect which a fire running through his land had had upon the timber growing thereon. We think it is manifest that the last two complaints are not well founded, because the proposed testimony was irrelevant and immaterial. Concerning the statements made by the foreman, Galbreath, there is more room for controversy; but, upon the whole, we have concluded that it was not shown that the statements in question were so coincident with an act which was being done at the time by Galbreath as to constitute them a part of the res gestæ, and it is clear that they

were not admissible on any other ground. It is most probable, we think, that the statements related to what had been done previously, and would have proven to be merely narrative of a past transaction, and inadmissible for that reason.

It results from what has been said that the judgment must be reversed, and the cause remanded for a new trial. It is so ordered.