## UNITED STATES v. DODSON.

(District Court, S. D. California, S. D. September 16, 1920.)

### No. 2062.

1. **Intoxicating liquors** ⟨key⟩**134—"Preserved sweet cider" defined.**

Under National Prohibition Act, tit. 2, § 4(f), permitting the manufacture for sale of "vinegar and preserved sweet cider," preserved sweet cider is cider without alcohol and in which the possibility of the natural development of alcohol has been prevented through treatment or the use of some sort of preservative.

2. **Intoxicating liquors** ⟨key⟩**134—Sweet cider containing preservative not "preserved sweet cider."**

Sweet cider to which has been added one-tenth of 1 per cent. of benzoate of soda which retards, but does not prevent, the development therein of substantially the normal maximum of alcohol, *held* not "preserved sweet cider," within the meaning of National Prohibition Act, tit. 2, § 4(f), although known in the trade as "preserved sweet cider."

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Preserve.]

3. **Intoxicating liquors** ⟨key⟩**236(13)—Charge of selling not sustained by proof of sale of sweet cider.**

An information charging defendant with the sale of cider containing more than one-half of 1 per cent. of alcohol *held* not sustained by evidence of the sale of sweet cider containing less than such per cent. of alcohol, although it later developed a larger content.

Criminal prosecution by the United States against John B. Dodson. Verdict of acquittal directed.

An information was filed against the defendant, alleging that on or about the 2d day of April, 1920, he did "knowingly, willfully, and unlawfully manufacture, prepare for market, and sell for beverage purposes and not for the

purposes of export certain intoxicating liquors in the manner as follows, that is to say: Said John B. Dodson did, at said time and place, manufacture, prepare for market, and sell to H. E. Houk, one 50-gallon barrel of cider, which said cider so manufactured and sold by said John B. Dodson was not put up and marketed in sterile closed containers, and was not treated in a manner to prevent fermentation, and to insure the alcoholic contents of said cider to remain below one-half of 1 per cent. of alcohol by volume, and which cider so sold by said John B. Dodson to said H. E. Houk then and there contained alcohol in excess of one-half of 1 per cent. by volume."

Subsequently the defendant was brought to trial before a jury on the information and it was developed therein that defendant was the manager and directive head of a company engaged in the manufacture and sale at wholesale of cider, the expressed juice of apples; that said company regularly added benzoate of soda, in the proportion of one-tenth of 1 per cent. by volume, to such juice so manufactured by it at the time of its manufacture; that this benzoate of soda did not, under normal conditions of heat and exposure to the air, prevent the fermentation of the cider so manufactured and so treated, but that it would merely retard such fermentation; that ultimately, in spite of the addition of the ingredient above named, the cider, in the course of a few days, under normal conditions, through the usual processes of fermentation, would develop its usual and normal maximum alcoholic content. The barrel of cider alleged to have been sold by defendant to Houk, a jobber, was finally purchased by a retail vender, and by him sold, in due course, to counter customers as a beverage. Upon its being tested, some days after delivery to the vender, and presumably several days after its manufacture and chemical treatment, as hereinabove referred to, it was found to possess alcohol to the extent of 4.8 per cent., by volume.

The proofs further showed, that apples of the sort and kind used in the manufacture of this particular cider, unaffected by the addition of any chemical agent, would, upon fermentation, develop a maximum alcoholic content of about 5 per cent. Proof was also adduced that in the trade, fresh cider, to which has been added one-tenth of 1 per cent. of benzoate of soda, is known as "preserved sweet cider." It was also in evidence, and uncontradicted, that the cider manufactured by defendant's company, at the time of its delivery to the vender above referred to, being immediately subsequent to its manufacture, contained less than one-half of 1 per cent. of alcohol. Upon the close of the case, defendant moved for an instructed verdict on the ground that proof had failed to show defendant guilty of any crime charged in the information or known to the law.

J. Robert O'Connor, U. S. Dist. Atty., and Burton Briggs Crane, Asst. U. S. Dist. Atty., both of Los Angeles, Cal.

Hudson P. Hibbard and Louis Kleindienst, both of Los Angeles, Cal., for defendant.

BLEDSOE, District Judge (after stating the facts as above). Counsel in this case have severally indicated that the matter involved is one of great importance, and in consequence the argument had on the motion made took a wider scope than was necessary for the determination of the bare question before the court. Appreciating the importance to the industry involved of a decision of the matter thus broadly presented, I have endeavored in the time available to give to the contentions advanced the consideration of which they were obviously deserving.

[1] In this behalf the somewhat unusual situation develops that I am constrained to disagree with the main argument advanced by defendant, and yet entertain no hesitation as to my duty to grant the

motion made by him. This follows because I believe that the only thing for which the defendant could be convicted in this case at all would be the crime of selling a beverage which contained more than one-half of 1 per cent. of alcohol. There is no adequate proof that he did that. Leaving out the suggestion that it was sold by the corporation rather than by defendant, the proof offered by the government is to the effect that, tested several days after it had been sold, and when, under all the evidence, and under the information that comes to us by means of common knowledge, the alcoholic content would have grown and increased, the beverage sold by him contained alcohol in excess of the amount allowed by statute. This is overcome by defendant's proof, however, that, when sold, the excessive alcoholic content was not present.

Considerable reliance was placed in argument by defendant on an unreported case decided by Judge Augustus N. Hand, of the Southern District of New York, August 17, 1920, Hildick Apple Juice Co. v. Williams, 269 Fed. 184. The controversy there arose over the question of the sufficiency of the allegations in the bill of complaint in a suit to compel the issuance of a permit to manufacture preserved sweet cider. Section 6, tit. 2, Volstead Act (41 Stat. 310). A motion was made to dismiss the bill, and Judge Hand indicates that he was bound by the allegations contained in the bill, with the consequent admission of their verity in virtue of the motion to dismiss, and, not having the facts before him, he held the bill sufficient in its averments to justify the relief asked. The case is hardly a precedent here; yet, if it goes to the extent claimed, I feel constrained to dissent from it in some of its broader aspects.

If anything is well settled and determined, it is that the Volstead Law, enacted pursuant to, and in consequence of, the adoption of the Eighteenth Amendment to the federal Constitution, was intended and calculated by Congress, and by those interested in its passage, to prohibit the manufacture, sale, and transportation, for beverage purposes, of any and every kind of intoxicating liquor within the United States; and Congress expressly defined such "intoxicating liquor" to be any spirituous, vinous, malt or fermented liquor or liquid "fit for use for beverage purposes" containing alcohol to the extent of "one-half of one per cent. or more" by volume. Volstead Law, tit. 2, § 1. So that by this law, which was enacted after much consideration of the circumstances and of the obvious intent and purpose of the people of the United States, as reflected by their ratification of the amendment, it was definitely and positively determined that any liquor or liquid, fit for use as a beverage, and possessing alcohol in excess of the maximum mentioned, might not be manufactured, sold, or transported in the United States. Even its mere possession was similarly prohibited, save under exceptional, severely necessary, and obviously harmless circumstances.

This conclusion results, not only from the reading of the act in its entirety, looking at the big purpose in view and the means to be employed to gain the end sought, but also from the language of section 3 of title 2, the controlling section of the act, which is to the effect that:

"No person shall on or after the date when the Eighteenth Amendment to the Constitution of the United States goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor, except as authorized in this Act, and all the provisions of this Act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented."

Here, in unequivocal language, we have a declaration on the part of Congress that, however this act may be viewed, and tested by every means known to those whose duty and function it is to construe statutes, in every instance the statute "shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented." Nothing can be plainer than that, and it seems to me that Congress there, as it might properly do, has said that the courts shall not seek to construe the statute so as to permit the use of intoxicating liquors as a beverage, but that they shall use all reasonable means to construe it so as to prevent such use.

In so far as the prohibition above mentioned applied to the manufacture, sale, or transportation of beverages, actually, as opposed to constructively, intoxicating, because of their alcoholic content, the congressional enactment was but an express recognition of the constitutional mandate. In so far as Congress, in aid of the general purpose of making possible the practical enforcement of prohibition, fixed a definite, maximum alcoholic content to "nonintoxicating" beverages, it was acting clearly within its competency, and was proceeding in a way calculated to the attainment of the ultimate and in view and the successful performance of the duty imposed upon it by the constitutional amendment. Rhode Island v. Palmer, 253 U. S. 350, 40 Sup. Ct. 486, 588, 64 L. Ed. 946, decided June 7, 1920; Ruppert v. Caffey, 251 U. S. 264, 40 Sup. Ct. 141, 64 L. Ed. ——.

In connection with the language herein above quoted from section 3, there is a matter referred to by Judge Hand in his decision. Hildick Apple Juice Co. v. Williams, supra. He says:

"It is important to note, however, that section 3, in spite of the prohibition clause, and the clause providing for a liberal construction of all the provisions of the act, in order to prevent the use of intoxicating liquor as a beverage, contains a careful limitation of its sweeping provisions in the words 'except as authorized in this act.'"

Now, that is true; but I cannot indulge in the implication therefrom that seems to have been indulged in by Judge Hand. This exception is merely in keeping with, and in recognition of, other specific provisions in the act permitting the manufacture, sale, possession, etc., of "intoxicating liquor" for certain nonbeverage purposes, such as sacramental, medicinal, etc., and for its possession in private dwellings only (title 2, § 25) for beverage purposes. It is in no wise inconsistent with, or counter to, the general purpose of the act, as I have endeavored hereinabove to set the same forth.

The position of the defendant herein is that, in virtue of certain provisions contained in section 4 of title 2 of the Volstead Law, he is authorized to make cider—express the juice of apples—and that he converts his immediate product into what is "known to the trade" as

"preserved sweet cider," merely by the addition of one-tenth of 1 per cent. of benzoate of soda, and that, thus treated, he may distribute, and his distributees may lawfully vend, the resulting product, irrespective of the alcoholic content or intoxicative effect that may develop after it shall have left his hands. And in this connection it must be remembered that under the proofs herein it is shown that the addition of benzoate of soda, in the minute quantity named (but being the maximum quantity usable in food products under the National Pure Food Law [Comp. St. §§ 8717–8728]), will not suffice at all to prevent fermentation and consequent development of alcohol; it merely retards such action. Under favorable (normal) conditions of heat, in this climate, fermentation will in the course of a few days proceed, and approximately the normal and usual quantity of alcohol, dependent upon the sugar content of the apple juice, will accrue in spite of the previous addition of the benzoate of soda.

In this wise, despite the admixture of the bonzoate of soda, the apples generally used by defendant, under the conditions normally obtaining, would develop alcohol to about 5 per cent. by volume. The cider in evidence herein showed almost that alcoholic content. Admittedly, such a beverage would be intoxicating. Obviously, it is clearly in excess of the alcoholic content permitted by the express terms of the Volstead Act, as already indicated. Section 4 of title 2, which has been referred to, says:

"The articles enumerated in this section shall not, after having been manufactured and prepared for the market, be subject to the provisions of this act, if they correspond with the following descriptions and limitations, namely:

"(a) Denatured alcohol," etc.

"(b) Medical preparations manufactured in accordance with formulas," etc., "unfit for use for beverage purposes.

"(c) Patented, patent, and proprietary medicines that are unfit for use for beverage purposes.

"(d) Toilet, medicinal, and antiseptic preparations and solutions that are unfit for use for beverage purposes.

"(e) Flavoring extracts and syrups that are unfit for use as a beverage, or for intoxicating beverage purposes.

"(f) Vinegar and preserved sweet cider.

"A person who manufactures any of the articles mentioned in this section * * * shall secure permits to manufacture such articles," etc.

To my mind, the idea there was that any one who prepared and manufactured the things specified should not be at all subject to the penal provisions of the act; in other words, any one had the right, pursuant to regulations which should be had, and in virtue of the permit provided for, to manufacture and prepare for the open market any of the things specifically named and described.

As showing that Congress, even in its grant or recognition of this privilege, was very careful with respect to the precise right to be enjoyed, it is to be observed that, not only were the sanctioned articles named and described with definiteness, but, in order that they should be within the exception created by the section, they had to "correspond with the following descriptions and limitations." This language, to my mind, indicates a sedulous endeavor on the part of Congress to

provide that the things which might be sold (by the manufacturer and thereby serve to protect any subsequent vender) must clearly and undisputably fall within the "descriptions and limitations" prescribed in detail. It seems clearly declaratory of, and in strict conformity to, the general purpose that "the use of intoxicating liquor as a beverage" was to be "prevented." And among the things "described and limited," which might be sold, in conformity with the general purpose announced, was "preserved sweet cider."

If, then, the thing actually manufactured and sold by defendant at wholesale was "preserved sweet cider," in virtue of the positive language of section 4, notwithstanding it might possibly develop, through the usual processes of fermentation, an alcoholic content in excess of the amount allowed by law, it was not at that time, or at any time thereafter, to be construed to be subject to the penal provisions of the Volstead Law. Parenthetically, however, if, at the time of its manufacture and distribution by the defendant, it was merely "nonintoxicating," because below the prohibited alcoholic content, yet was not in fact "preserved sweet cider," and it afterwards developed the proscribed alcoholic content—in the language of the street, "acquired a kick"—its subsequent sale would render the vender liable to all the provisions of the act respecting an unlawful marketing of a prohibited article, viz. "intoxicating liquor."

So it would seem that, in substance, under the argument addressed to the court by defendant, the duty of the court is to declare what Congress meant in section 4 by the use of the words "preserved sweet cider." It is hornbook law, of course, as declared in 36 Cyc. 1106, that:

"The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature. This intention, however, must be the intention as expressed in the statute, and where the meaning of the language used is plain, it must be given effect by the courts, or they would be assuming legislative authority. But where the language of the statute is of doubtful meaning, or where an adherence to the strict letter would lead to injustice, to absurdity, or to contradictory provisions the duty devolves upon the court of ascertaining the true meaning. If the intention of the Legislature cannot be discovered, it is the duty of the court to give the statute a reasonable construction, consistent with the general principles of law."

The same authority (page 1114) states the rule to be that:

"In the interpretation of statutes, words in common use are to be construed in their natural, plain, and ordinary signification."

And in this behalf I understand the practice to be general among courts, in endeavoring to ascertain what the "ordinary signification" of a word or phrase is, to have recourse to the usual avenues of information made use of by those concerned with the meaning of a word or phrase, to wit, acknowledged and accepted lexicographical authorities. In such an exigency, I have turned to the Century Dictionary, which I understand to be a recognized authority in the matter of definitions of terms in common use, and dependent upon popular usage and general acceptance for their meaning, and there find definitions which I deem of aid to the court in the pending controversy.

"Cider" is defined as:

"Formerly, any liquor made of the juice of fruits; now, the expressed juice of apples, either before or after fermentation."

That is the definition of the generic term "cider." Descending to the species, the definition proceeds:

"Hard cider—fermented cider; cider that has lost its sweetness from fermentation."

In passing, I think that is a definition and description that has long been familiar to the great mass of the common people, viz. that "hard cider" was cider that possessed a stimulating and intoxicating effect, due to its acquisition of a substantial and potent alcoholic content, through the processes of fermentation.

"Sweet cider," another species, "is cider before fermentation, or cider in which fermentation has been prevented." That definition seems simple and decisive. It is to the effect that sweet cider is cider which has not yet become "hard cider"; that is, has not acquired an alcoholic content by fermentation. "Fermentation" is defined in the same dictionary as:

"A decomposition produced in an organic substance by the physiological action of a living organism, or by certain unorganized agents."

This description conforms in every respect to the testimony given in this case, respecting the production of alcohol in cider through the processes of fermentation. The Century continues:

"It may be checked or altogether prevented by anything which prevents the growth of organisms, as by exclusion of the germs or spores, by subjection to a temperature too high or too low, by the presence of too large a proportion of sugar, or of a substance called an antiseptic, which acts as a poison to the organism. Alcoholic fermentation in saccharine solutions," of which cider is one, "or fermentation in its most restricted sense, may be produced by one of several organisms."

The same authority says of the word "preserve," of which "preserved" is the past participle, that it means:

"To prepare in such a manner as to resist decomposition or fermentation; to prevent from spoiling by the use of preservative substances, with or without the use of the agency of heat."

Now, I gather from these definitions, coming from a recognized authority, that "preserved sweet cider," that article which is to be without the terms and beyond the purview of the penal provisions of the Volstead Law, must be not only "sweet cider"—cider which has not fermented; cider which is devoid of alcoholic content coming from fermentation—but also that it must be "preserved"; it must be cider to which some preservative, in the nature of heat or otherwise, has been applied, contributed in sufficient quantity to insure that its sweetness and its nonfermented, nonalcoholic state may be maintained. In other words, it must not only be "sweet cider," within the meaning to be accorded to that term, as defined by authorities; it must be "preserved" sweet cider. Or, to phrase it still more simply, "preserved sweet

cider," under the accepted definition, is cider without alcohol, and in which the possibility of the natural development of alcohol has been prevented, through the use of some sort of preservative.

[2] Evidence has been offered, similar to the allegation in the same behalf in the Hildick Case, supra, that in the trade, and by the custom and usage of the cider business, "preserved sweet cider" is understood to be merely ordinary cider "to which one-tenth of 1 per cent. of benzoate of soda has been added." As above adverted to, it is also in evidence that such addition does not prevent the accrual of substantially the normal maximum alcoholic content. It merely serves to retard such accrual.

The net result is that in the long run, by the time the consumer goes to purchase it at retail (if a few days shall have elapsed), the maximum alcoholic content will have developed, despite the addition of the chemical; and, the maximum alcoholic content being approximately $4\frac{1}{2}$ or 5 per cent. by volume, an actual and substantial intoxicative effect will likewise have developed. In the case at bar, four or five days after delivery to the vender by the defendant, the cider was found to contain alcohol to the extent of 4.8 per cent. by volume.

Now, I do not believe that Congress, when, with obvious and solicitous care it enacted the Volstead Law, ever intended that any such result should be made possible under its permissive terms. Having determined that prohibition should be made effective and a fact, and that the general possession and use of intoxicating liquors should not be allowed; having, in furtherance of that broad purpose, in a sense at least, stricken down the great vineyard interests of this and of other states, by saying that their fermented products might not be manufactured and vended, as they theretofore had been, I cannot believe that it at the same time intended to exclude and except, from the limitations and liabilities resting upon all other people, merely those persons who were so fortunate as to be involved in the growth or the vending of apples, or the cider that might be expressed therefrom. In other words, no possible reason may be advanced why Congress, deliberately and by decisive language, should have prohibited the sale of the juice of the grape, whatever its alcoholic content, so long as it equaled or was in excess of one-half of 1 per cent., and at the same time openly, avowedly, and intentionally permitted the sale of the juice of the apple, irrespective entirely of what its alcoholic content might be, or might become, so long, forsooth, as it contained one-tenth of 1 per cent. of benzoate of soda. It cannot be imputed to Congress that it had any such unjust and inconsistent intention—an intention directly counter to the general purpose of the act, as I have heretofore indicated, and an intention, as a matter of fact, going in the very teeth of the constitutional amendment itself, which prohibited the manufacture, sale, and transportation of all "intoxicating liquors," whether they were the product of the apple, the grape, or otherwise.

The rational construction of the act, and of this portion of it, therefore, I conceive to be to the effect that he who would make a vendible beverage from apples is under the same sort of general obligation and limitation as he who would make a vendible beverage from

grapes; if it be intoxicating, it cannot be sold; if it be not intoxicating, it may be sold. And again, for purposes of emphasis, no less than of clarity, the degree of alcoholic content specified in the statute is determinative of whether or not it is, within the terms of he law, intoxicating.

Counsel argues that there was no reason for inserting the clause referring to "preserved sweet cider" in section 4 unless it was the intention thereby to legalize the manufacture and sale of cider of normal alcoholic content; in other words, that cider without the proscribed alcoholic content could be sold anyhow, and in complete disregard of the act, because of its lawful and innocuous nature, and that the actual insertion and mention of the thing referred to as "preserved sweet cider" was itself a demonstration that something, which under the law otherwise might not be sold, might, in view of this specific provision, be sold anyhow.

The difficulty with this argument is that, taken in connection with other things referred to in section 4, and particularly in clause (f), it proves too much. "Vinegar" is mentioned in clause (f) as a thing that, "having been manufactured and prepared for the market," shall not be "subject to the provisions" of the act. If counsel's argument were well taken, vinegar, which ordinarily would fall in the same category as nonalcoholic cider, with respect to its harmlessness and vendibility, need not have been mentioned in the statute. The fact that it was expressly mentioned shows that Congress was not intending, by section 4, to permit the sale of something which otherwise might not have been permitted.

A possible, and I think the probable, reason for the insertion of both these items was because of the apprehension that might have been indulged in by Congress that perhaps, in spite of all of the steps that might be taken, in conformity to regulations or otherwise, to insure the preservation of the nonalcoholic quality of either "vinegar" or "preserved sweet cider," it might possibly eventuate that, due to the operation of natural agencies and chemical changes, fermentation might ensue or continue, and alcohol in prohibited quantity thereby develop. For that reason the provision was made that if the things mentioned, to wit, "vinegar and preserved sweet cider," corresponded with the designated "descriptions and limitations," they should not, after having been manufactured and prepared for the market, pursuant to and in accordance with the terms of the permit to be exacted, be subject to the provisions of the act. In other words, if the thing was in fact "preserved sweet cider" at the time of its manufacture and preparation for the market, but thereafter developed some alcoholic element or content in excess of the amount allowed by law, in spite of provision taken to prevent such result, that fact or condition should not serve to render it an unsalable thing. But by the same token it was expressly declared, as I sense it, that the thing that is to be manufactured and prepared for the market was to be "preserved sweet cider"; that is, cider devoid of the prohibited alcoholic content, and preserved in such a way as that the subsequent development of the prohibited alcoholic content would, in all probability, be prevented.

This conclusion, I think, is substantially supported by another clause in the act, found in section 29, the section devoted to penalties, and reading as follows:

"The penalties provided in this act against the manufacture of liquor without a permit shall not apply to a person for manufacturing nonintoxicating cider and fruit juices exclusively for use in his home but such cider and fruit juices shall not be sold or delivered except to persons having permits to manufacture vinegar."

It must be remembered that the "liquor" referred to in this provision is, as above stated, any liquid of the proscribed alcoholic content. So the provision is declaratory that the penalties provided for the manufacture of any liquid containing alcohol in excess of the one-half of 1 per cent. without a permit shall not apply to a person for manufacturing nonintoxicating cider (that is, cider containing less than one-half of 1 per cent. of alcohol) exclusively for home use. But in this connection a positive inhibition is laid upon the sale of such cider to any one except to a person having a permit, and therefore intending to use the cider, for the manufacture of vinegar. In other words, it may not be vended for beverage purposes.

If, as broadly contended by defendant, it had been intended by secton 4 that intoxicating cider might be manufactured and vended with impunity, Congress would never have inserted the provision that nonintoxicating cider might be made merely for home use, and that its sale should be restricted to those who were intending to use it for vinegar only. In other words, the net result of the inclusion of this provision is to make more manifest the general intent and purpose of Congress heretofore adverted to, viz. that the vendibility generally, and the possession and use outside of the home, of intoxicating liquors for beverage purposes, is taboo.

Referring again to the decision of Judge Augustus N. Hand in the Hildick Case: He seems to have felt himself bound by the language of the complaint which was before him, and the verity of which was admitted by the motion to dismiss. It was therein alleged that the product resulting from the expressed juice of fresh apples, treated by the admixture of one-tenth of 1 per cent. of benzoate of soda, "is and for many years has been known as 'preserved sweet cider.'" It was also alleged, further on in the bill, that the products therein under consideration "are made from unadulterated juice of apples, and that they are preserved in the best way practicable, and that their product is 'preserved sweet cider.'"

This is merely another way of stating the fact and contention, above adverted to, that if the cider actually made has been treated with one-tenth of 1 per cent. of benzoate of soda, and is therefore in the trade known as "preserved sweet cider," then, irrespective and in spite of its actual alcoholic content and intoxicative effect, it is still vendible and possessable, in the face of the prohibitory provisions of the Volstead Law. However, I do not think that the understanding or practice of the trade, or a custom or usage of the art involved, is to control the construction of an act of Congress. Usage or custom is frequently resorted to, in practice, to explain or render less uncertain what the

parties may have had in mind in entering into a given contract. In Union Pacific R. R. Co. v. U. S., 10 Ct. Cl. 548, however, it was held that, as to a statute, its construction, and therefore enforcement, must be in accordance with the rules applicable to the construction of statutes, rather than according to the rules applicable to the construction of contracts.

In the same spirit, the Circuit Court of Appeals of the Eighth Circuit, in U. S. v. Pine River Logging & Improvement Co., 89 Fed. 907, at page 915, 32 C. C. A. 406, at page 414, had occasion to construe the meaning to be accorded to the phrase "dead timber," as used in a certain statute applicable to the controversy. The defendants had offered testimony to the effect that the phrase had acquired a certain meaning in consonance with their contentions "by reason of a well-known custom or usage prevalent throughout the United States, or prevalent throughout a large portion of the United States." In response to this the court said:

> "The proper office of a custom or usage is to explain the meaning of a private contract which is so vague or uncertain that the intent of the parties thereto cannot be determined without the aid of such extrinsic evidence. Barnard v. Kellogg, 10 Wall. 383; Robinson v. U. S., 13 Wall. 363. And while it may be that proof of a custom or usage is sometimes admissible to aid in the construction of a statute, as well as a private contract, yet when it is offered for that purpose, and with a view of altering the ordinary meaning of ordinary words or phrases, the evidence concerning the usage ought to show that it was prevalent in all sections where the law was to become operative, and was so far universal in the sections where it prevailed, as to leave no room for doubt that the usage was known to the lawmaker, and that the statute which it serves to modify was enacted with reference thereto."

It suffices to say that the proof in this case, irrespective of what the allegations in the complaint before Judge Hand may have amounted to, falls short of measuring up to the requirements stated in the opinion just cited. There may have been a custom in the trade respecting the name to be accorded to cider treated with the slight percentage of benzoate of soda. There is nothing to indicate, however, that Congress was apprised of such usage or custom; and if the recognition of such usage or custom carries with it the implication that any cider so treated, irrespective of its actual alcoholic content and intoxicative effect, might be vended and possessed generally, as defendant herein contends, it is so opposed to the general spirit and intent and assumed purpose of Congress in the enactment of the Volstead Act as to justify the conclusion that Congress was not in any way advised thereof.

So, in conclusion, my holding is that Congress, in the enactment of this statute, did not, in any wise or at all, intend to permit the general and unrestricted sale of cider, if at the time of such sale it actually contained an amount of alcohol in excess of that allowed by law, irrespective of whether or not it had previously been treated by a preservative; in other words, that the intent of Congress was, that for cider to be vendible, the alcohol should be out of it; not merely that a preservative should be in it.

[3] The defendant herein, however, is charged with having sold cider that did contain more than one-half of 1 per cent. of alcohol. There is matter contained in the information to the effect that the cider manufactured and sold by him was not—

"put up and marketed in sterile closed containers, and was not treated in a manner to prevent fermentation, and to insure the alcoholic contents of said cider to remain below one-half of 1 per cent. of alcohol by volume."

The language quoted, and apparently made a part of the charge sought to be placed against the defendant, is taken from section 36 of the Regulations adopted and promulgated by the Commissioner of Internal Revenue, pursuant to authority vested in him in the Volstead Act (section 1 of title 2). It specifies the means whereby the expressed juice of the apples may be converted into and continued as "preserved sweet cider." No statute, however, makes a violation of any such regulation a punishable crime, and therefore defendant may not be penalized in this proceeding, even if it be shown that he has committed such violation. U. S. v. Eaton, 144 U. S. 677, 688, 12 Sup. Ct. 764, 36 L. Ed. 591.

In so far as we are concerned with the case, the only charge is a sale of cider containing the proscribed alcoholic content. Of this there is no proof in the case that will satisfy me, and therefore I feel that I am justified in instructing the jury to return a verdict of not guilty on both counts, with respect to the crime lawfully and appropriately charged.